## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:  IMAGITAS, INC., DRIVERS'
PRIVACY PROTECTION ACT
LITIGATION,                                        Case No. 3:07-md-2-J-32HTS

                                    Applies to:   Case No. 3:06-cv-690-J-32HTS

_____

## <u>ORDER</u>

### I. Background

On July 20, 2004, Imagitas[1] and the Florida Department of Highway Safety and

Motor Vehicles ("DMV" or "Florida") entered into a five year contract ("the contract")

whereby Imagitas furnishes and mails notices to Florida vehicle owners in

participating counties reminding them to renew vehicle registrations[2] "in [envelopes]

including public information and advertising." Doc. 71, Ex. F at 2.1.[3]  As part of this

_____

   [1]Defendant Imagitas, Inc., a wholly owned subsidiary of Pitney Bowes, Inc., is a marketing company that, since 1992, has engaged in partnerships with government agencies which combine marketing materials with redesigned government informational publications distributed through public mailings and websites. Examples of its work include change of address forms and new resident welcome kits from post offices.

   [2]Although Florida law requires vehicle owners to renew their registrations annually (or, effective January 1, 2008, biannually at the owner's option), it does not require the state to remind them.  Fla. Stat. §§ 320.02(1), 320.031(1), 320.055.  Florida apparently does so as a public service.

   [3]Record citations herein are to the 3:06-cv-690-J-32HTS file unless otherwise noted.

contract, Imagitas requires that it receive from the DMV both the listing of vehicle registration renewals to be issued in a particular month ("the Renewal File"), as well as the listing of all vehicles owned at every address ("the Registration File").[4]  By combining these two files, Imagitas has developed its proprietary "DriverSource" program, that permits it to sell targeted advertising using what it calls a "household view" developed from the vehicle identification numbers, the dates of purchase, and the 5-digit zip codes for all vehicle owning households in the participating county. Through earlier failed advertising efforts in Florida using driver's license renewal mailings, Imagitas learned that having the Renewal File without the Registration File does not allow for an effective advertising program.  Imagitas does not release either of the files to its advertisers (and its contract with the DMV specifically forbids such disclosure) but uses these files to determine what advertising to place in each particular renewal envelope.

Under the contract, Florida approves each advertisement in writing and retains the right to remove any ads "that may conflict with the best interest of the state at the

---

[4]The monthly Renewal Files contain information needed to contact registrants whose vehicle registrations are due to be renewed in a particular month in a subscribing county, including the registrant's name, address, the vehicle identification number ("VIN"), and title issue date for the vehicle.  The annual Registration File (updates to which are received by Imagitas on a weekly basis) contains the same information, but for all vehicles registered in Florida.  The VINs are compared to a commercially available database to determine various vehicle attributes, such as make, model, and year of vehicle.

[DMV's] discretion."  Doc. 71 at Ex. L at 3.  Additionally, the contract states that the advertising shall be "in accordance with" Florida Statute section 283.58, which permits a state agency to allow a private vendor to publish and produce public information materials and to include advertising of "products or services related to and harmonious with the subject matter of the publication."  Fla. Stat. § 283.58(1)(a).

Thus, under the contract, no vehicle owner received an advertisement that had not been approved by Florida.  Advertisements from Ford Motor Company, Home Depot, Sirius Radio, West Marine, DirecTV (and various others) have been mailed as part of the program.  The average Florida registration renewal envelope contains about 4 advertisements.  The registration packet includes a disclaimer that any enclosed advertising is not an endorsement by the State of any advertiser's products or services and an assurance that personal information is not used for purposes other than preparing the renewal packet.  The inclusion of advertising is intended to offset the costs of the registration renewal (including paper, printing and mailing) and other public service type announcements included in the mailings.[5, 6]  Once the costs and Imagitas' overhead are covered, Imagitas and Florida share the remaining profits (though Florida's share is negligible, ranging from 0-3%).  The contract provides that

---

[5]The inclusion of solicitations for various non-profit organizations is mandated under Florida law.  See, e.g., Fla. Stat. § 320.02(8), (13), (15), (16).

[6]County tax collectors pay some of the postage from their respective county budgets.

Florida's share of profit may be paid with in-kind services or in another acceptable form.  Doc. 71, Ex. J (BAFO) at 5 (describing the "Success Sharing" program); Doc. 71, Ex. I (Charles Dep.) at 64-65.  In the contract, Florida and Imagitas describe their relationship as a "public/private partnership."  Doc. 71, Ex.B at 45.

State DMVs collect personal information from drivers and automobile owners as a condition of driving on state roads.  Reno v. Condon, 528 U.S. 141, 143 (2000).  By the early 1990's, sales of this information to individuals and businesses had become a significant revenue source for many states.  Id. at 143-44.  Concerns with both safety and privacy over the use of drivers' records led Congress to pass the Driver's Privacy Protection Act of 1994 (the "DPPA"), 18 U.S.C. §§ 2721, et seq.  See, e.g., Statement of Congressman James P. Moran Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary on H.R. 3365, The Driver's Privacy Protection Act of 1993, 103d Cong. (1994), 1994 WL 212698 (Feb. 4, 1994). "The DPPA generally prohibits any state DMV, or officer, employee, or contractor thereof, from 'knowingly disclos[ing] or otherwise mak[ing] available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record.'" Condon, 528 U.S. at 144 (quoting 18 U.S.C. § 2721(a)) (alteration in original).

The DPPA includes several statutory exceptions to the general prohibition against the DMV's release of personal information.  Some of these exceptions are

4

mandatory and others are permissive.   The mandatory disclosures are listed in section (b) which provides that the DMV "shall" disclose personal information "for use in connection with" various matters involving motor vehicle or driver safety, theft, emissions, recalls, and title clarifications.   § 2721(b).   The numerous permissive exceptions are listed in sections 2721(b)(1) through (b)(14) and include disclosures such as for use by government agencies in carrying out their functions, for research, for insurance claims investigations, for court proceedings, for employment verification, for providing notice to owners of towed vehicles, and various other uses.   Some of these disclosures, such as for bulk distribution for marketing or solicitations, require consent of the person to whom the personal information pertains.   § 2721(b)(12).   As originally passed, the statute permitted states to assume this consent for all purposes if drivers did not expressly "opt-out" or decline to have their information released. Condon, 528 U.S. at 144.   The 1999 amendment to the DPPA changed the "opt-out" alternative to an "opt-in" requirement under which states must secure express consent to disclose a driver's personal information for certain enumerated purposes.   Id. at 144-45.

Plaintiffs in Rine v. Imagitas (3:06-cv-690), who filed suit on August 1, 2006, are Columbia County residents who received registration renewal mailings from the State of Florida with enclosed advertisements and solicitations pursuant to the DMV's contract with Imagitas.   Plaintiffs claim Imagitas' DriverSource program violates the

DPPA.  If permitted to proceed as a class action, plaintiffs claim that "several million" Florida drivers are potential class members.  See Doc. 15.  In addition to criminal fines (not at issue here), the DPPA permits recovery of (and plaintiffs seek) compensatory damages, liquidated damages of $2,500 for each violation, as well as attorneys' fees.  18 U.S.C. § 2724(a),(b)(1),(3).[7]

Imagitas answered the Amended Complaint on October 10, 2006 (Doc. 10) and thereafter sought Multi-District Litigation ("MDL") treatment of this and similar cases filed around the country.  On May 9, 2007 the MDL panel ordered the centralization of 8 cases before the undersigned.  Tag-along cases, including some against various state DMV officials, were added or transferred so that there are now a total of 13 cases in this MDL litigation, 9 of which are against Imagitas:  1 case in the Middle District of Florida, 1 case from the Southern District of Florida, 2 cases from the District of Massachusetts, 1 case from the District of Minnesota, 1 case from the Western District of Missouri, 1 case from the Southern District of New York, 2 cases from the Northern District of Ohio; and 4 cases which are against state DMV officials, 1 each in Florida (Rine v. Dickinson), Minnesota, Missouri and Ohio.[8]  In July 2007,

_____

[7]See Amended Complaint (Doc. 3).   The statute also permits "such other preliminary and equitable relief as the court determines to be appropriate." § 2724(b)(4).

[8]The complaint against Florida officials includes a DPPA claim and a section 1983 claim (which is available for privacy right violations arising out of violations of the DPPA; see Collier v. Dickinson, 477 F.3d 1306, 1310-11 (11th Cir. 2007)).

the Court  issued a scheduling order setting the Rine cases (Rine v. Imagitas and Rine v. Dickinson) for briefing and hearing on January 31, 2008 and, with the consent of all parties joined at that time, abating action in all other cases.[9]

On October 2, 2007, the Florida state officials and plaintiffs filed a "Joint Notice of Agreement to Settle" in which the parties announced they had reached an agreement and would be moving for preliminary approval of a settlement.  See Doc. 50 in 3:07md2.  They have not yet filed a motion seeking approval but have filed their Letter of Understanding, embodying the terms of their agreement.  See Doc. 57 in 3:07md2.

On December 14, 2007, the United States filed its "Statement of Interest" (Doc. 71 in 3:07md2) pursuant to 28 U.S.C. § 517, on grounds that the United States' enforcement role under the DPPA gives it a significant interest in ensuring that the statute is properly interpreted, particularly given the number of states involved in this case and the total amount of damages sought and because the constitutionality of a federal statute may be involved.

Plaintiffs claim that the statutory framework of the DPPA does not allow for the DriverSource program as operated by Imagitas.  Imagitas disagrees and is moving

_____

[9]No party has since sought any different treatment of the abated cases, except that the state official defendants from Missouri, Minnesota and Ohio recently filed motions seeking to have the Court recommend their cases be released from this MDL and returned to their home courts.  The Court will address these motions by separate Order.

for summary judgment (Doc. 71) on grounds that its DriverSource program does not run afoul of the DPPA; that interpreting the statute in the manner plaintiffs suggest would render the statute an unconstitutional infringement on First Amendment protected speech; and that, even if there has been a violation, Imagitas is entitled to qualified immunity. The Court's analysis is governed under the rubric of the well-known summary judgment standards. See Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). However, except for one material issue, discussed below, there are no real disputes about the facts. Thus, this case is mostly about applying largely undisputed facts to the DPPA to determine whether Imagitas has violated the DPPA. Indeed, the MDL parties requested a limited time for discovery and then asked the Court to consider the case via this motion for summary judgment.[10]

These matters are now fully briefed.[11]   On January 31, 2008 the Court

_____

[10]While this ruling will only govern the Florida Rine v. Imagitas case, the parties in the abated cases apparently hope this decision will provide some guidance in those cases.

[11]See Imagitas' Motion for Summary Judgment, Doc. 71, with exhibits and additional attachments at Doc. 72, 73, 74, 78, 80, 86 and sealed Docs. S-2 to S-4; plaintiffs' response, Doc. 91 with exhibits attached thereto and sealed Docs. S-5, S-6; Imagitas' reply brief (Doc. 96); the United States' Statement of Interest (filed as Doc. 71 in 3:07-md-2); and plaintiffs' response to the United States' Statement of Interest (filed as Doc. 82 in 3:07-md-2).

conducted a day-long hearing on the motion, the transcript of which (Doc. 94 in 3:07-md-2) is incorporated by reference.

## II.  Discussion

The DPPA statutory arrangement is such that section 2721(a) sets forth the general prohibition against the disclosure of personal information provided by motorists and vehicle registrants to the DMV and section 2721(b) and its various subsections set forth the exceptions to section (a)'s general prohibition.  Thus, the analysis here requires the Court to consider whether Imagitas' DriverSource program as operated in Florida triggers section 2721(a)'s general prohibition and, if so, whether a section 2721(b) exception applies.

A.  Application of section 2721(a)

The DPPA's general prohibition against the release of personal information states:

> (a) In general.–A State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity:
> (1) personal information, as defined in 18 U.S.C. 2725(3),[12] about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section; or

_____

[12]Personal information, as defined by 18 U.S.C. § 2725(3), is "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status."

> (2) highly restricted personal information, as defined in 18 U.S.C. 2725(4),[13] about any individual obtained by the department in connection with a motor vehicle record, without the express consent of the person to whom such information applies, except uses permitted in subsections (b)(1), (b)(4), (b)(6), and (b)(9): *Provided*, That subsection (a)(2) shall not in any way affect the use of organ donation information on an individual's driver's license or affect the administration of organ donation initiatives in the States.

§ 2721(a) (emphasis in original).

Imagitas argues that section 2721(a) authorizes Florida's and Imagitas' use of DMV records because this section contemplates that these groups (the state and its contractors) may *use* the information provided they do not *disclose* it or *make it available* to others, reasoning that they could not be in a position to make the mandatory and permissive disclosures allowed under section (b) and (b)(1)-(14) of the statute if they did not have *use* of the personal information in the first place.  Imagitas therefore contends that because the statute contemplates *use* by the government *and* its contractors, both Florida's action in delivering the information to Imagitas and Imagitas' subsequent use of the information to provide targeted mailings for its sponsoring advertisers are permitted by section 2721(a) and the Court need look no further.

---

[13]Highly restricted personal information, as defined by 18 U.S.C. § 2725(4), "means an individual's photograph or image, social security number, medical or disability information."

10

Putting aside for the moment the question of whether Imagitas engages in any conduct that triggers section 2721(a), the plain language of that section prohibits "a State department of motor vehicles" from "knowingly disclos[ing] or otherwise mak[ing] available to *any person or entity*" "personal information."  § 2721(a) (emphasis added).  Thus, the DMV's disclosure of personal information to Imagitas (as "any person or entity") is itself conduct governed by the DPPA. See <u>Ali v. Fed. Bureau of Prisons</u>, 128 S.Ct. 831, 836-37 (2008) (holding that, unless otherwise limited by its statutory context, the word "any" has an expansive meaning, contemplating no basis for limitation); <u>see also</u> <u>Kehoe v. Fid. Fed. Bank & Trust</u>, 421 F.3d 1209, 1212 (11th Cir. 2005) (interpreting the DPPA: "In construing a statute, we must begin, and often should end as well, with the language of the statute itself [ ] because we presume that Congress said what it meant and meant what it said.") (quotation omitted), <u>cert. denied</u>, 126 S.Ct. 1612 (2006).  Although plaintiffs have apparently settled their claims against the DMV in Florida,[14] inquiry into the state's conduct is nonetheless relevant because Imagitas' mere receipt of information from the state DMV could trigger liability of Imagitas under the statute. <u>See</u> § 2722(a) ("It

_____

[14]In <u>Rine v. Dickinson</u>, these same plaintiffs contended that the Florida DMV officials also violated the DPPA by participating in the DriverSource program. However, because the plaintiffs and the Florida officials have announced a proposed settlement, the Court is not being asked to rule on the issues raised by that case. Nevertheless, the DMV's role in the DriverSource program continues to be relevant to whether Imagitas has DPPA liability.

11

shall be unlawful for *any person* knowingly *to obtain* or disclose personal information, from a motor vehicle record, *for any use* not permitted under section 2721(b) of this title.") (emphasis added); <u>see also</u> § 2724(a) (setting forth civil cause of action for "knowingly obtain[ing], disclos[ing] or us[ing] personal information, from a motor vehicle record, for a purpose not permitted under this chapter").  Indeed sections 2722(a) and 2724(a) further support a reading of section 2721(a) that all disclosures by the DMV- - even to its own contractors- - are generally prohibited.

However, in generally prohibiting disclosures of personal information by the DMV, Congress has not prevented the DMV from disclosing such information for use in carrying out its own functions because, as further discussed below, the statutory exceptions, including (b), (b)(1), (b)(2), and (b)(14) easily capture the gambit of DMV activity for which disclosure of personal information would be needed.  <u>See</u> <u>Condon</u>, 528 U.S. at 144-45 (describing the "general prohibition" of section (a) and the "statutory exceptions" to the prohibition outlined in section (b)); <u>see also</u> <u>Ali</u>, 128 S.Ct. at 837 (explaining that the Court's construction of a statutory term "must, to the extent possible, ensure that the statutory scheme is coherent and consistent"); <u>Connecticut Nat. Bank v. Germain</u>, 503 U.S. 249, 253 (1992) (holding that sections of a statute need not be mutually exclusive and in fact may overlap or be redundant in terms of their coverage, provided neither section contains limiting language to the contrary). The Court therefore rejects Imagitas' reading of the statute which would always permit

the DMV to disclose personal information to its own contractors pursuant to section 2721(a), without regard to whether any exception under section 2721(b) would permit the disclosure.  Put another way, the DMV's knowing disclosure to Imagitas is prohibited by section 2721(a) unless permitted by a statutory exception in section (b).[15]

B.  Application of subsection 2721(b)(1)

Section 2721(b) contains the exceptions to section 2721(a)'s general prohibition against the disclosure of personal information.  The first part of (b) directs mandatory disclosure for certain uses and is followed by fourteen subparts of (b), which contain additional permissive disclosure uses.  One of these, subsection 2721(b)(1), allows disclosure by a state DMV of personal information

> [f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

§ 2721(b)(1) (emphasis added).

The application of this subsection to Imagitas' DriverSource program in Florida requires the resolution of four issues:   first, whether the state DMV can take

---

[15]Because the Court finds the plain language of section 2721(a) compels this conclusion, it does not consider the various legislative history arguments advanced by the parties on this point, including the significance of remarks of sponsoring legislators and the construction and interpretation given similar legislation.  See, e.g., United States v. Gonzales, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history.").

advantage of this subsection as "any government agency;" second, whether the DriverSource program uses personal information to "carry out a function" of the state DMV; third, whether Imagitas is an entity "acting on behalf of" the state DMV when it uses personal information to effectuate the DriverSource program; and fourth, whether the various part (b) subsections are mutually exclusive, such that another subsection, 2721(b)(12), which specifically addresses the bulk distribution of marketing and solicitation materials, must be complied with instead.

    1.    Is the DMV "'any' government agency" for purposes of subsection 2721(b)(1)?

Plaintiffs argue that the DMV's needs for the use of personal information are met by the main part of section 2721(b) and that the generic reference to "any government agency" in subsection 2721(b)(1) is reserved for the use of personal information by agencies other than the DMV.[16]  To be sure, much of the DMV's need to use personal information to contact vehicle owners would likely be covered by the requirements of section 2721(b) which directs mandatory disclosure

> for use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring of motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner records from the

---

[16]In all fairness to plaintiffs, this is an argument Imagitas itself made earlier in this litigation.  However, Imagitas' primary position has always been that there is no disclosure in the first place so the Court does not fault it for any inconsistency in its alternative positions.

> original owner records of motor vehicle manufacturers to
> carry out the purpose of titles I and IV of the Anti Car Theft
> Act of 1992, the Automobile Information Disclosure Act (15
> U.S.C. 1231 et seq.), the Clean Air Act (42 U.S.C. 7401 et
> seq.), and chapters 301, 305, and 321-331 of title 49[.]

§ 2721(b).  Although not specifically mentioned, contacting drivers to renew their motor vehicle registrations could well be contemplated as being "in connection with matters of motor vehicle . . . safety."  Id.  However, nothing in the language of the DPPA directs that one exception must apply to the exclusion of all others.  Indeed, there is repetition within the statutory exceptions, as evidenced by a comparison of section 2721(b) and subsection 2721(b)(2), which are nearly identical, except that the latter apparently would not include the disclosure of "highly restricted personal information" whereas the former may.  Compare also subsections 2721(b)(1) and (4) (both specifically permitting disclosure for use by courts). See Connecticut Nat. Bank, 503 U.S. at 253 (holding that sections of a statute may overlap and court "need not choose" between giving effect to one over the other unless statutes pose "an either-or proposition").

The language of subsection 2721(b)(1) cannot be read to exclude the DMV where Congress chose the word "any" to describe the federal, state, or local government agencies that could use personal information in carrying out their functions.  Additionally, given that the DMV is the custodian of the personal information, it would be an odd construction to restrict the DMV's disclosure of that

15

information to itself to the specific instances listed in (b) but to permit any other government agency to seek use of the information to "carry out its functions," whatever they may be.  Instead, read together, the plain language of section (b) and subsection (b)(1) explain that the DMV <u>must</u> disclose personal information for the various specific uses included in section (b) and that it <u>may</u> additionally disclose personal information to "any" government agency, including itself (or those acting on its behalf), for use in carrying out its government functions.  <u>See Ali</u>, 128 S.Ct. at 836-37; <u>Connecticut Nat. Bank</u>, 503 U.S. at 253.  <u>See also</u>, <u>Miller v. Image Data, LLC</u>, 91 Fed. Appx. 122, 2004 WL 326998, at *3 (10th Cir. 2004) (noting that defendant's proposed use of personal information for fraud prevention program fell "squarely within *several* of the [DPPA's] fourteen permissive disclosure exceptions") (emphasis added).

2. <u>Does the DriverSource program "carry out an agency function" of the DMV?</u>

The disclosure exception of subsection 2721(b)(1) requires that the personal information be used in "carrying out [a government agency's] functions."  This phrase is not further defined by the statute.  Imagitas argues that the agency function for which personal information is used is Florida's "decision to provide advertising space as well as the economical mailing of its renewal forms," by creating a self-funding informational mailing.  Doc. 71 at 16.  Plaintiffs have not taken issue with the DMV goal of providing economical mailings for its renewal forms.  Rather, the debate here

centers on whether the State's inclusion of advertising as a means of securing the economical mailing is a legitimate "function" of the DMV.

Under Florida law, Florida agencies are permitted to enter into agreements with private vendors which will bear the costs of producing public information materials or provide compensation to the agency in exchange for including commercial advertising in public information materials so long as the advertised product or service is "related to and harmonious with the subject matter of the publication."  Fla. Stat. § 283.58. Imagitas argues that by this grant of authority, the DriverSource program is a legitimate government function that is carried out by the DMV's disclosure to Imagitas of personal information which is used to mail the DMV motor vehicle registration renewal packets.

Plaintiffs take issue with this position on two grounds.  First, plaintiffs claim this program is just an end-run around the clear prohibition against the direct sales of drivers' personal information, sales which Florida's DMV had previously continued in flagrant violation of the DPPA.  Second, plaintiffs claim that any cloak of legitimacy lent to the program by virtue of the parties' contract disappears in the face of Imagitas' manipulation of the personal information in ways not contemplated or understood by the Florida DMV.

As originally adopted, the DPPA permitted states to assume drivers consented to the release of their personal information for use in surveys, marketing, solicitations

17

and in response to individual motor vehicle record requests, unless drivers "opted-out" by affirmatively withholding their consent.  See Condon, 528 U.S. at 144.  The 1999 amendment to the DPPA changed the "opt-out" provision to an "opt-in" provision, meaning that the states could no longer imply consent; rather, drivers' personal information could only be released for these reasons upon express consent.  Id. at 144-45; Pub. L. No. 106-69, 113 Stat. 986, § 350(c)-(d) (1999).  As amended, "[t]he language of Sections 2721(b)(11)-(13) unambiguously requires the consent of individuals before their motor vehicle record information may be released."  Collier v. Dickinson, 477 F.3d 1306, 1310-11 (11th Cir. 2007), cert. denied, 128 S.Ct. 869 (2008).  In response to the amendment, "[f]orty-nine states immediately passed legislation to ensure compliance with [the opt-in provisions of] the DPPA."  Kehoe, 421 F.3d at 1210.  "Florida was the only state that did not immediately comply," waiting until May 13, 2004 to amend its state public records statute to end the non-consent release of drivers' personal information for mass marketing purposes.  Id.

In the face of such historical resistance by Florida to the DPPA, plaintiffs suggest it is no surprise that Florida would sign up for Imagitas' DriverSource program, which permits the state to continue to enjoy the revenue previously gained when it sold drivers' records to marketers, by instead including advertising in a government mailing.  Indeed, plaintiffs argue this format is even more offensive than an unsolicited "junk" mailing which consumers can throw away without even opening.

Here, with Imagitas' DriverSource program, drivers are exposed to unsolicited commercial advertisements contained within an "official" state registration renewal notice.   Plaintiffs contend such a program cannot possibly be viewed as a "government function" of the DMV.[17]

Imagitas, of course, views its program in a different light.  To Imagitas, the 1999 "opt-in" amendment to the DPPA put a stop to the disclosure and repeated re-disclosure of motor vehicle records to mass marketers, who were free to send a largely unrestricted stream of mailings to motor vehicle drivers and registrants. Imagitas' program, on the other hand, uses personal information for the purpose of including a few additional inserts in a government mailer that a vehicle registrant is going to receive anyway.  The advertisers never have access to the individual drivers' information and there is no opportunity for the advertisers to re-disclose the information or to follow up with the prospective customers (unless those customers respond to the ad).  Additionally, the mailer includes a disclaimer explaining that the advertised products and companies are not endorsed by the state and assuring

---

[17]Plaintiffs find support for this position in the way in which Imagitas sold the DriverSource program to potential advertisers, heralding the program as a key to reaching consumers through driver records otherwise shielded by the DPPA , noting the program's capacity to "unlock" the DMV Database and the "exclusive partnership" enjoyed by Imagitas with State DMVs, and promoting the "99.9%" rate at which the government mailer containing the sponsors' advertisements will be opened because such advertisements, with the accompanying government imprimatur, will "slip[ ] below the radar" encountered by other direct mail campaigns, thereby creating "a marketing nirvana."  See S-6 (in camera Exhibit 9 to Doc. 91).

registrants that their personal information is not used for purposes other than preparing the renewal mailing.

Moreover, Imagitas correctly points out that Florida law already permits the DMV to solicit contributions in its registration renewal mailings for various organizations, such as "Save the Manatee," "Mothers Against Drunk Driving," "Child Safety Seats," "Election Campaign," "Marine Turtle Protection," and others.  Just as Florida law allows these solicitations to be included in government mailings,[18] so too is commercial advertising permitted to be included in government mailings because Florida Statute section 283.58 allows a state agency to "enter into agreements to secure the private publication of public information brochures, pamphlets, audiotapes, videotapes, and related materials for distribution without charge to the public" and to

> [e]nter into agreements with private vendors for the publication or production of such public information materials, by which the costs of publication or production will be borne in whole or in part by the vendor or the vendor agrees to provide additional compensation in return for the right of the vendor to select, sell, and place advertising that publicizes products or services related to and harmonious with the subject matter of the publication.

Fla. Stat. § 283.58(1)(a).

---

[18]See, e.g., Fla. Stat. §§ 320.02(8), (13), (15), (16)(a)-(e); see also, Fla. Stat. § 320.023 (outlining process for organizations seeking to solicit voluntary contributions in motor vehicle registration packets).

Thus, Florida law contemplates that a function of its state agencies, such as the DMV, may be to enter into agreements with vendors who place advertising in government publications in exchange for bearing the costs of production or publication or for compensation.[19]  Indeed, the contract between Imagitas and the Florida DMV mandates compliance with Florida Statute section 283.58.  While the imprimatur of a state law grant of authority would be insufficient to legitimize a program that otherwise violated the DPPA, Collier, 477 F.3d at 1312 n.3 (citing Condon, 528 U.S. at 151), such is not the case here.  In Collier, the Eleventh Circuit found state law, which permitted non-consent sales of driver records, offered no protection to DMV officials who directly violated the DPPA by selling drivers' personal information without their consent to mass marketers for bulk distribution of marketing and solicitation materials.  Collier, 477 F.3d at 1312, n.3.  See also, Collier v. Dickinson, No. 04-21351-CIV-2006 WL 4998653, at *15 (S.D. Fla. Mar. 30, 2006) (describing Florida law which governed at relevant time); aff'd in part, rev'd in part by Collier, 477 F.3d 1306.[20]  By contrast, the contract between Imagitas and the DMV,

_____

[19]Plaintiffs argue that advertising to generate revenue is not a permissible DMV function because only the legislature can authorize the raising of revenue.  However, Florida Statute section 283.58 is legislation which allows an agency to receive compensation "in return for the right of the vendor to [advertise]" provided the other terms of the statute are satisfied.

[20]It does not appear that any contention was made in Collier that the section (b)(1) exception applied.  According to counsel for the DMV, the Collier case is now back in the trial court in the discovery phase.

undergirded by state law by virtue of Florida Statute section 283.58, does not result in an arrangement in violation of federal law.  Rather, subsection 2721(b)(1) of the DPPA permits the disclosure of personal information to a government agency, such as the DMV, for use in carrying out its functions.  One of those acknowledged functions is mailing out registration renewal notices and Florida law specifically allows the DMV to contract with private vendors to financially support this function with advertising included in the renewal mailings.  Unlike in Collier, however, here the governing Florida law does not result in the disclosure of personal information to the advertisers; rather, the registrants' personal information remains in the control of the DMV and its contractors for use in carrying out the motor vehicle registration renewal process.  Thus, at least on its face, the DriverSource program, as described in the contract between Florida and Imagitas, satisfies the DPPA requirement of subsection 2721(b)(1) that the disclosure of personal information be used to carry out a government agency function.  See McQuirter v. City of Montgomery, Alabama, No. 2:07-CV-234-MEF, 2008 WL 401360, at *5-6 (M.D. Ala. Feb. 12, 2008) (holding that disclosure of driver's license photos and names by police to television media to publicize results of prostitution sting, was use in carrying out agency function within meaning of § 2721(b)(1) because disclosures to media "can apprize the public of risks created by dangerous suspects at large, can bolster public confidence in law enforcement activities, can advise the public of information needed to increase public

safety, and can act as both a general and a specific deterrent to criminal activity," notwithstanding that innocent identity-theft victim's photo was included in the release).

Plaintiffs, however, fairly ask, if the DMV cannot collect revenue by selling drivers' personal information to marketers (as found violative of the DPPA in Collier), then why can the DMV raise revenue by allowing Imagitas to use the personal information to include advertising (from perhaps those same marketers) in the renewal mailings?  The answer is that in Collier, the DMV was not performing one of its "functions" when it sold drivers' personal information to advertisers for use (or re-disclosure) however the purchaser saw fit, and the revenue the DMV collected from that program went for general purposes.  Here, the disclosure of personal information to Imagitas and Imagitas' use of it was in direct support of the DMV's function of mailing registration renewals and the revenue the state generated from the advertising was used primarily to defray the expense of the renewal process. Moreover, the advertising program was not only authorized by Florida law, Fla. Stat. § 283.58, but also directly supervised by DMV officials who approved each advertisement.  Thus, while recognizing that both in Collier and here, the State is disclosing drivers' personal information to third parties (in Collier, to advertisers, and here, to Imagitas) and receiving money for doing so, the differences in the two situations are sufficient such that, while the Collier scenario, unaided by a (b)(1) justification and resulting in the disclosure of personal information for purposes

beyond any government function, violates the DPPA, the DriverSource program, conceived and executed pursuant to the "government function" (b)(1) exception of the DPPA, does not.

Plaintiffs, however, argue that even if the DriverSource program appears on paper to satisfy the government function requirement, its operation belies such conclusion because Imagitas does not simply use the personal information to stuff envelopes with government materials and appropriate advertisements.   Rather, Imagitas manipulates the personal information using a sophisticated analysis to target particular ads to particular residents, which plaintiffs claim takes the use of personal information beyond what is necessary for carrying out any possible DMV function of mailing advertising-funded registration renewal packets.   Additionally, the Florida statute requires that the advertisements publicize "products or services related to and harmonious with the subject matter of the publication," Fla. Stat. § 283.58, yet plaintiffs claim Imagitas has included advertisements from a variety of sponsors, such as DirecTV and others, whose products or services fail to have any "relation" to or "harmony" with motor vehicle registrations.

Imagitas' DriverSource program uses the monthly list of registration renewals and combines it with the annual list of vehicle registrations to create an algorithm that categorizes vehicle owners according to the total number, type, and age of vehicles owned by each household, creating a "household view" that permits sponsors to

24

target their advertising to particular households.  For example, an American motor vehicle manufacturer may wish to send advertisements for its new luxury line of SUVs to residents in households located in a wealthy neighborhood (based on zip code) who might be in the market for a new car soon because the residents of the households already own two vehicles- - a new American-made luxury model sedan and an import SUV purchased over six years ago.  Imagitas' DriverSource program provides that type of market information to its sponsors.  It does not, however, provide the personal information to the sponsors and sponsors cannot, therefore, locate or identify any particular individual.

Plaintiffs claim this segmentation of the personal information provided in the registration files is not contemplated under the parties' contract and that it is performed without the knowledge of state officials, thus removing any "government function" protection otherwise afforded to the program.  However, while the contract does not contain Imagitas' algorithm or explain the details of the "household view" formula, Imagitas' Best and Final Offer, which is incorporated into the parties' contract (see Doc. 91, Ex. 3.2, §3.11, incorporating contractor's proposal), does explain that Imagitas' ability to secure sponsors to underwrite the DMV registration renewal mailings depends on Imagitas' ability to quantify the number of vehicles per household to which registration renewal mailings will be sent over a given year and to have access to the vehicle identification numbers and the dates of purchase of

25

those vehicles.  See Doc. 71-12 (BOFA) at 6.  The Best and Final Offer explains that "as discussed in [Imagitas' and the DMV's] negotiation," this information is used to "ensure that the mailings are as relevant as possible to the recipients."  Id.

As noted in these references, Imagitas and the DMV engaged in negotiations regarding their contract.  Forrest J. Gould, a former Imagitas Vice President who participated in at least some of those negotiations, has provided a declaration in which he states that Florida officials were advised during negotiations as to Imagitas' data usage plans, including its "intelligent insertion" advertising plan and the "household view" databases, which Gould says officials were told were "absolutely critical and necessary to the fulfillment of the [State's Invitation to Negotiate]."  See Doc. 78 at 1-2.  Mr. Gould further provided copies of PowerPoint materials that he states were used during the presentation to DMV officials to explain the program.  Id. These materials explain that the data would be segmented, that information about all vehicles at the same address was required, and that "householding" made the advertising more "relevant" to the consumer.  Doc. 78, Ex. X.  This presentation also explains that Imagitas' arrangement with the state would comply with the DPPA because Imagitas was a "private entity acting on behalf of DMV in carrying out its functions" and personal information was not disclosed to advertisers.  Id. at 8, 9.

Although the Florida officials named as individual defendants in Rine v. Dickinson, faced with this litigation, have now attempted to distance themselves from

26

the DriverSource program with the affidavits filed in support of their pending settlement with plaintiffs, see Doc. 63 in 3:07-md-2, those affidavits, even if admissible, do not refute Mr. Gould's representations that the Florida officials who negotiated the contract knew about the targeted advertising used with the household view program and knew how Imagitas used the personal information contained in the Registration and Renewal files.  Moreover, it is undisputed that Florida officials consistently sent to Imagitas not only the Renewal file (obviously needed to mail the monthly registration renewals) but also the much larger Registration file (needed only to allow Imagitas to create the "household view").  Thus, plaintiffs have failed to create an issue of fact to rebut Imagitas' showing that Imagitas' segmentation of the personal information was contemplated under the parties' contract and was performed with the knowledge of state officials.[21]

As to plaintiffs' argument that the program fails to comply with the "related to and harmonious with" language of Florida Statute section 283.58, here too, the Court finds the program as operated under the parties' contract satisfies these requirements as it appropriately places the burden of ensuring compliance on the Florida officials who approve, in advance, in writing, every single advertisement.  This arrangement is consistent with the requirements of the statute, which directs that an agency of the

---

[21]Plaintiffs feebly suggested at the summary judgment hearing that perhaps more discovery was needed on this issue.  But it was plaintiffs who, instead of deposing the Florida officials, decided to settle with them and rely upon their affidavits.

state entering into an agreement with a vendor for the publication or production of government materials financially supported by advertisements "[r]etain the right, by agreement, to approve all elements of any advertising placed in such public information materials, including the form and content thereof."   Fla. Stat. § 283.58(1)(b).  The statute does not define what it means for an advertisement to be "related to" or "harmonious with" the subject matter of a government publication and the discretion for making such subjective determinations rests with the Florida officials charged with implementing the agreement.  Moreover, even if it were demonstrated that a particular ad did not meet these standards and that an official had abused his or her discretion in approving it, that alone would not be a basis to find that Imagitas (or Florida) is operating a program that does not carry out an agency function within the meaning of subsection 2721(b)(1) of the DPPA.

> 3.   Is Imagitas "acting on behalf of" the Florida DMV in carrying out the DriverSource program?

Plaintiffs contend that even if the DPPA would permit the DMV to carry out a program that involved the inclusion of solicitations with motor vehicle registration renewal packets, Imagitas' activity is not similarly protected because it cannot demonstrate that it is an agent or representative that has acted "on behalf of" a government agency as the (b)(1) exception requires.  Rather, plaintiffs claim that pursuant to Imagitas' contract with Florida, Imagitas is an independent contractor which cannot act "on behalf of" the DMV.

28

The DPPA does not define what showing is necessary to demonstrate action "on behalf of" a government agency. By reference to other authorities, plaintiffs argue that action "on behalf of" is met by showing a party acts as an "arm" of the sovereign, such as would be required to secure Eleventh Amendment or qualified immunity protection, or by reference to statutes addressing, for example, state action. Requiring such a showing, however, does not appear consistent with the language or intent of the DPPA and would render it difficult for a government agency to contract with any entity to carry out its functions. Moreover, disclosing personal information to contractors is contemplated under the statute, as referenced by section 2721(a)'s language prohibiting DMV *contractors* from releasing personal information, information which they presumably could only have through an authorized disclosure in the first place. Plaintiffs' reading of the statute would, for example, prevent the DMV and all other government agencies from contracting with independent printing and production companies to assemble mailing materials that are sent to drivers or motor vehicle registrants, because the relationships between the government agencies and their contractors would not meet the standards plaintiffs argue should apply here.

In <u>Miller v. Image Data LLC</u>, 91 Fed. Appx. 122, 126 (10th Cir. 2004), the court held that an independent contractor who obtained personal information for its identity verification system used by the Secret Service to combat identity theft met the

29

subsection 2721(b)(1) exception as the collection was done "on behalf of" a government agency in carrying out a function.  Similarly, in <u>McQuirter v. City of Montgomery, Alabama</u>, No. 2:07-CV-234-MEF, 2008 WL 401360, at *6 (M.D. Ala. Feb. 12, 2008), the court held that a police department employee's release of personal information to the media for redisclosure to the public was permitted by subsection 2721(b)(1)'s allowance for "redisclosure for use by private persons or entities acting on behalf of federal[,] state or local agencies in carrying out agency functions."  In short, the legal relationship plaintiffs claim is missing here is not required for an entity to be "acting on behalf of" a government agency as used in the DPPA.  Reading the contract between Florida and Imagitas (which refers to their relationship as a "public/private partnership"), reveals that Imagitas has contracted with the state to completely redesign, repackage and administer the mailing of the DMV's registration renewal process, actions which Imagitas could not take except while acting "on behalf of" the DMV.  Ex. B to Doc. 71.  The Court therefore finds Imagitas has acted "on behalf of" the DMV for purposes of DPPA subsection 2721(b)(1).[22]

---

[22]In other contexts, the phrase has likewise been given a broad scope.  <u>See, e.g.,</u> <u>Craven v. United States</u>, 215 F.3d 1201, 1207 (11th Cir. 2000) (interpreting federal tax regulation and determining "on behalf of" should be given a "plain meaning such as 'in the interest of' or 'as a representative of'").

4.    Must the subsection 2721(b)(12) exception be met instead?

Plaintiffs argue that even if Imagitas demonstrated that its DriverSource program met the requirements of subsection 2721(b)(1), this subsection is not available to it because another exception- - subsection (b)(12)- - specifically addresses the conduct at issue (mass marketing activities) and Imagitas must (and cannot) demonstrate that it meets the terms of that subsection.   Subsection 2721(b)(12) allows disclosure by a state DMV of personal information "[f]or bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains." § 2721(b)(12) (emphasis added).

For two reasons, the Court finds plaintiffs' position unavailing.  First, as discussed above with reference to whether the (b) and/or (b)(1) exception permits disclosure to the DMV, the statutory exceptions are not mutually exclusive by their terms, meaning that any one or more of them may be applicable to a given situation. See Connecticut Nat. Bank, 503 U.S. at 253.  For example, the broad (b)(1) exception seems to cover every use permitted by the (b)(4) exception and both the mandatory (b) section and permissive (b)(1) section would seem to include any use permitted by (b)(14).[23]  Therefore, satisfaction of (b)(1) is enough to allow the conduct here, even

---

[23]The (b)(14) exception states that personal information may be disclosed by the DMV "[f]or any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety."

31

if (b)(12) may also appear to fit the conduct.  <u>See, e.g.</u>, <u>Miller</u>, 91 Fed. Appx. at 126 (discussing how at least two different DPPA statutory exceptions covered use of personal information).  <u>Cf.</u>, <u>Hartman v. Dept. of Conservation & Nat. Res.</u>, 892 A.2d 897, 904-05 (Pa. Commw. Ct. 2006) (holding state agency decision to deny snowmobiling club magazine publisher's request for personal information pursuant to subsection (b)(2) was supported by substantial evidence where agency found subsection (b)(2) (which permits disclosure for use in connection with motor vehicle safety) would not support disclosure because safety issues limited to one article in one issue of magazine, "primary" purpose of which was to promote snowmobiling and club membership, and request was therefore subject to (b)(12) consent).

Second, the (b)(12) exception addresses a situation- - that of releasing personal information into the marketplace where it may be used and reused- - which is not occurring under the DriverSource program.  With the DriverSource program, personal information is never released to anyone other than the DMV and Imagitas (in its work on the DMV's behalf).  Sponsors whose advertisements are sent with the registration renewal materials have no way to identify registrants or contact them directly, to recontact them in the future, or to give or sell their personal information to others.  There is no direct disclosure of personal information to advertisers at all.  This

_____

Imagitas raised the application of the (b)(14) exception as a defense in its answer here (Doc. 10, ¶ 21) but has not argued its application on summary judgment.

is in contrast to conduct which the (b)(12) opt-in language sought to prohibit, such as where Florida DMV officials compiled personal information about drivers and, without their consent, "reformatted it into customized mailing lists, and sold these lists to various third parties for bulk distribution for surveys, marketing, solicitations, or other purposes," Collier, No. 04-21351-CIV, 2006 WL 4998653, at *2; or when Fidelity Bank purchased personal information about individual motor vehicle registrants from the DMV and mailed them solicitations to refinance their auto loans without securing express consents.  Kehoe, 421 F.3d at 1210-11.[24]

Plaintiffs argue that the effect on the individual vehicle owner is the same because, just as with the DMV sales in Collier or Fidelity's mailings in Kehoe, the DriverSource program results in the receipt of unwanted solicitations in the mail, all as a result of the DMV disclosing personal information for purposes seemingly unrelated to that for which such information was provided- - to renew a motor vehicle registration.  While perhaps true, the DPPA does not prevent government agencies from sending marketing materials, surveys, or solicitations to registrants, provided such mailings are in furtherance of carrying out a government function, because such

_____

[24]The Kehoe court did not reach the question of whether Fidelity could be liable if it did not know that the DMV had failed to secure consents, an issue raised by Fidelity as a defense in the case.  See Kehoe v. Fid. Fed. Bank & Trust, No. 03-80593-CIV, 2004 WL 1659617 (S.D. Fla. June 14, 2004), rev'd, 421 F.3d 1209 (11th Cir. 2005). See also, Fid. Fed. Bank & Trust v. Kehoe, 126 S.Ct. 1612 (2006) (J. Scalia, concurring in the denial of cert.) (noting that the scienter issue remained "open" but that Supreme Court consideration would be premature).

conduct is expressly permitted by the (b)(1) exception.  To hold otherwise would essentially mean that, absent express consent, the DMV could not solicit contributions for the numerous public interest groups it now solicits for, such as Mothers Against Drunk Driving, Organ Donations, and Children's Hearing Help Fund.  The DPPA does not reach so far.[25]

Under the DPPA, there are a variety of permissible uses of personal information.  Subsection (b)(1) is one source of such uses, provided the user is a government agency or acts "on behalf of" one; subsection (b)(12) is another source, one which anyone can avail themselves of, provided express consent is secured first.  Several of the exceptions overlap in their coverage- - the language of the DPPA does not compel a government agency (or anyone else) to meet one exception where another applies.  See Connecticut Nat. Bank, 503 U.S. at 253 (holding that absent limiting language to the contrary, sections of a statute may overlap or be redundant

---

[25]Plaintiffs suggest that the (b)(12) exception should be read to say that the bulk mailing of "commercial" surveys, marketing or solicitations requires express consent and that, therefore, the non-profit organizations whose messages are included in the current DMV mailings would not be subject to the (b)(12) express consent requirement.  While some solicitations now included in the DMV mailer (such as for Mothers Against Drunk Driving) might otherwise be sent pursuant to an exception addressing motor vehicle or driver or public safety (such as (b)(2) or (b)(14)), others, such as the Miami Heart Research Institute, likely could not meet another exception. Other than unpersuasive reference to the DPPA legislative history, plaintiffs offer no support for their "commercial" versus "non-profit" distinction.

in terms of their coverage).[26]  The Court therefore rejects plaintiffs' contention that the (b)(12) exception governs the conduct here to the exclusion of the (b)(1) exception. In reaching this determination, the Court has carefully considered whether the Eleventh Circuit's decisions in Kehoe or Collier compel a finding that the DPPA has been violated in this case.  However, in Kehoe, the defendant admitted violating the DPPA and the decision focused only on the issue of damages.  421 F.3d at 1212.  In Collier, the section (b)(1) exception was not argued as a basis for disclosure (nor could it have been under the facts of that case), and the Eleventh Circuit's strong views regarding the clarity of the language of the DPPA must be read in the context of the exceptions at issue in that case- - (b)(11), (b)(12) and (b)(13).  477 F.3d at 1309-10.  Thus, while both cases are instructive, neither controls the result here.

C. Does Imagitas' role or conduct change the DPPA analysis?

The above analysis generally describes why Florida, using the assistance of an entity such as Imagitas, can operate a program such as DriverSource, under the (b)(1) exception.   It does not fully address, however, whether Imagitas has independently run afoul of the DPPA for its activities.

_____

[26]To further illustrate this point, personal information as defined in the DPPA would always be requested for drivers either individually or in bulk.  Subsection (b)(12) provides for release in bulk, with consent; and (b)(13) provides for release individually, with consent.  Therefore, virtually <u>every</u> release of personal information could be governed by either (b)(12) or (b)(13).  Yet there are twelve other subsections which authorize release of personal information and eleven of them permit such release without consent, provided the terms of the exception are otherwise met.

Once personal information is disclosed by the DMV to Imagitas pursuant to section 2721(a), Imagitas "uses" the information, but does not disclose it to its advertisers.[27]  However, section 2721(a) also prohibits contractors of the DMV from "mak[ing] available" personal information.  Plaintiffs claim that by allowing advertisers to use the DMV envelope (with the name and address of the vehicle registrant) to send their ads, Imagitas gives its advertisers access to the DMV motor vehicle records and thereby "makes available" personal information.  Uses of the term "make available" in other statutes (which term is not defined in the DPPA or addressed in its legislative history) suggest it means that the information be available *for viewing.*  See 18 U.S.C. §§ 3006A(d)(4); 2518; Fed. R. Crim. P. 16(a)(1)(B); 5 U.S.C. § 552(a)(1). Courts have likewise held that a party failed to meet its obligation to "make available" information when the party did not allow the other side to view and decipher the information.  See United States Dept. of Justice v. Tax Analysts, 492 U.S. 136, 153 (1989) (in context of government failure to satisfy FOIA request).  With this guidance, the Court finds that permitting advertisers to include solicitations in the DMV registration renewal envelope does not mean Imagitas "makes available" personal information about the vehicle registrants to the advertisers.

_____

[27]Of course Imagitas does in turn disclose the personal information to its printing vendor to effectuate the DriverSource renewal program, which disclosures are also subject to DPPA compliance.  Plaintiffs, however, have not sought to hold Imagitas liable for any such disclosures, recognizing that if Imagitas' use is permitted under the DPPA, its subcontractors' use would no doubt be covered as well.

Similarly, while it is true that Imagitas manipulates the information in the files to allow its sponsors to select certain categories of registrants to receive advertising while excluding others, the advertisers are not provided with the protected names and addresses (the only "personal information" used in Imagitas' household view algorithm), and the effect of the targeting on the registrants' privacy is no different than if every registrant received the same ad.[28]   The Court concludes that Imagitas' DriverSource program does not "make available" personal information to its advertising clients within the meaning of the DPPA.

### III.  Conclusion

This case has required the Court to construe the DPPA to determine whether Imagitas' DriverSource program violates that statute.  The Court has found that Imagitas' DriverSource program, as operated under Imagitas' contract with Florida, does not violate the "letter" of the DPPA.  Taking a step back, however, the DPPA was passed to protect drivers' privacy, limit dissemination of drivers' personal information, and restrict mass mailings generated through the use of personal information that drivers must, by law, provide to the state.  Imagitas' DriverSource

-----

[28]This type of targeting would be substantially the same as having Florida decide to include "Save the Manatees" solicitations only in mailings sent to registrants living in counties where manatees are most likely to be found.  In either case, the effect on registrants' privacy is the same- - only the DMV and those acting on its behalf can contact the registrant.

program, which results in those drivers receiving an official government envelope bearing unsolicited commercial advertising, could well be argued to violate the "spirit" of the DPPA (and indeed, Imagitas' marketing of the program to advertisers, touting its "insider" access to otherwise protected information, supports this view).  Moreover, because Congress has heavily regulated this field by passing the DPPA, those participating in a program such as DriverSource proceed at their peril lest the particular implementation of it run afoul of the statute.  Notwithstanding these considerations, the Court's task is to apply the DPPA to the precise, undisputed facts of this case.  Finding the question close, the Court holds that Imagitas has not violated the DPPA in its implementation of the DriverSource program in Florida.[29]

Accordingly, it is hereby

**ORDERED**:

1.    Imagitas' Motion for Summary Judgment (Doc. 71 in 3:06-cv-690-J-32HTS) is **GRANTED**.  The Clerk shall withhold judgment pending further Order.

2.    By separate Order, the Court will solicit the parties' views as to how the

---

[29]Because the Court finds Imagitas' DriverSource program as operated in Florida does not violate the DPPA, the Court need not reach Imagitas' alternative arguments. Additionally, plaintiffs have raised a number of arguments which are variations on their theme as to why the DPPA is violated in this case.  While the Court has considered all of these arguments, to the extent they are not specifically addressed in this Order, the Court has found them to be without merit.

other member cases should proceed.[30]

       **DONE AND ORDERED** at Jacksonville, Florida this 9th day of April, 2008.



TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:
counsel of record

---

[30]One final (foot)note:  while the parties to the other MDL cases are certainly welcome to look to this decision for whatever guidance it may offer, and can rightfully expect this Court to be consistent in its reading of the statute, the Court cannot foreclose the possibility that different facts or arguments made in future cases might produce a different analysis or even result.

39